Court. My name is John Scott. I represent the plaintiff and appellant Adam Snyder in this matter, Judge Thomas, the third time I've seen you this year. Nice to see you again. Yes, nice to see you. There are three issues I would like to address. I'm going to take about eight or nine minutes now. Mr. Cunningham, who represents co-plaintiff Mr. Santora, is going to take four or five minutes. We'd like to reserve at least four or five minutes for rebuttal. Three issues I'd like to address have to do with, first, the affirmative act issue. Second, the approximate cause issue. I'd like to distinguish this case from the Huffman case in Van Orden and tell the Court why I think those cases help us. And third, I'd like to address the issue of just the causation issue in general. And it's an issue we raise in a footnote, but it's an interesting issue, and that is, does the approximate cause test apply here, or since Canton versus the Canton case, should it be the moving force analysis that should apply here as opposed to approximate cause? But let me get back to affirmative act. The Huffman case recognizes that a written policy is essentially an affirmative act by a municipality or a police department. Doesn't seem to be any dispute that if you have a written policy, that's an affirmative act. Well, by the same notion, if you have a well-established custom and practice, an unwritten policy, why isn't that an affirmative act? It just seems to me it defies logic to say that if a municipality has a written policy, that's an affirmative act. But if you have a well-established custom that somehow isn't formal and isn't written, that the implementation of that custom doesn't involve Let's assume we agree with you on point one. Why don't you go to point two? Because at least as far as I'm concerned, that's the one of the critical issues in the case. And that's how you distinguish Hoffman and the other cases. Thank you. Let me get let me first talk about the Van Oort case, because it came before Huffman. And in the Van Oort case, you have a you have a police officer who had a checkered past and who had a history of excessive force. But he'd had three complaints sustained against him. This wasn't a situation where you had a renegade officer, a bad officer who had never been disciplined or identified. In fact, he'd been disciplined. He'd been transferred. In that case, the department was taking steps to try to control this. This this officer obviously had some problems. But most importantly, the conduct that he did off duty, a home invasion and an armed robbery was not anything like the conduct he had done on duty. I mean, it's you know, if you read the facts of Van Oort. I mean, this guy with a ski mask and latex latex gloves broke into a house and and put up some kind of something over somebody's head, put lighter fluid on it and said, I'm going to set you on fire if you don't tell me the combination to your safe. I mean, this is not what he was doing on duty. And this was in that case for the court to say what he did off duty was was unforeseeable compared to what he's doing on duty. I get it. They're different. And so it seems to me we have a situation where you could say to that police department what he did off duty was so far, you know, beyond anything he was doing on duty that this was unforeseeable. Agreed. But the court in Van Oort didn't say if he had done conduct similar to what he'd been doing on duty, if he had just kind of beaten somebody up or up somebody up on the street, they didn't say that wouldn't be unforeseeable. They just said under the facts of that case, that was unforeseeable under approximate cause analysis. Now, what about Hoffman? Hoffman was a case really about written policies, competing written policies. You had three written policies of the Los Angeles police department, sheriff's department, but you had three written policies. One required officers to carry guns off duty. You had a second policy that said you're not supposed to get drunk and disorderly off duty. You had a third policy that said you're supposed to identify yourself as a police officer. If you're off duty, you have to get involved in a situation and take some kind of steps to quiet it down or to control a situation. Actually, a good policy. I wish San Francisco had that policy, because just think about it. You're a police officer off duty. You've got a gun. A fight breaks out in a bar. Something happens on the street. And wouldn't it be wonderful to say, hey, wait a minute, stop. I'm a cop. I got a gun. I got a badge. And you just better, you know, slow down, buddy. And I think twice before you swing at me. Say something to me. Cause a problem. So these officers have guns. San Francisco. No, they didn't. Well, as far as we know, they didn't. There's no evidence that they did. Well, they were searched for guns, weren't they? That's unclear. They didn't have guns. We don't even know when and if they were ever searched and if the truck was ever searched. So it seems that when there's some material in the grand jury investigation that indicated that they had been searched for guns. Yes, but it's unclear when and where. But my point simply is in the Huffman case, the issue came down to competing written policies and the argument that the plaintiffs were trying to make in Huffman was if you have a policy that police officers are supposed to carry guns off duty, it's foreseeable that some cop is going to get drunk at a bar and get into a barroom brawl and he's going to shoot somebody. That was foreseeable. And the court said, no, wait a minute. You also have policies that say you're not supposed to be inebriated and disorderly off duty. And if you have a situation that requires, you know, you to quell the situation, you're supposed to identify yourself. And the court said, and most importantly, Huffman did not have a history of excessive force, of violence, of gunplay. I mean, there's no history here that Deputy Huffman was some kind of out-of-control renegade officer and that, geez, if we don't do something about his conduct on duty, he's going to do something off duty. Is it your position that if you have complaints against an individual officer that involve violence on the job, that the city then becomes liable for every off-duty act of violence by the officer? Absolutely not. So what's the difference between that, your, the statement you just made and this case? Because what happened off duty was virtually identical to what he did on duty. This was his modus operandi. If you look what Officer Fagan did on duty, he was belligerent, he was pushy, he was confrontational, and he used excessive force. That was the common theme. If you look at the Stansbury memo and everything they knew about him on duty, this was his M.O. It went unchecked. He was led, because it was unchecked, he was led to believe he could get away with his conduct, whether it was on duty or off duty, as long as he was within the city limits. Okay. Well, let's accept that, then, as the first part of the hypothetical. Given that you have an officer like that, does that make the city liable for every off-duty act of violence by that officer? Not necessarily, no. So what's different about this case? It seems to me, shouldn't a jury decide in this case whether there's a causal relationship? I mean, aren't inferences supposed to be drawn in my favor, in my client's favor, on summary judgment? It seems to me, Your Honor, you're drawing, you're playing devil's advocate, and I appreciate that. Well, I'm supposed to be doing that. Yes, you are. But you're also supposed to be drawing inferences in our favor. Of course. But if there's no rule of law that says that we impose strict liability on a city, once you have some complaints against an officer, how do we extend it as a matter of law? It's not you have to have a legal theory to get to a jury. Nobody's talking about strict liability, Your Honor. Well, it's pretty close to it. I mean, if you're saying that you're liable, once you have notice of this violent proclivity, that you're liable for off-duty conduct. No, we're not saying that, because you have to have a custom or a policy. If a city doesn't have a custom. Yes, I'm presuming all of that. All right. Yeah. Then it seems to me it's an issue of causation. I mean, the question in Van Orden, Huffman, and so forth, is to what extent is a city liable for off-duty conduct? Yes. And those cases go against you. I understand the distinctions you try to draw. What's your best case for you? Well, there is no case for me, because there aren't many of these cases out there. But I would argue that if you look at the reasoning, the legal reasoning of Van Orden and Huffman, they don't say under no circumstances can a municipality ever be liable for off-duty conduct. That seems to be what you're saying. But they don't say that. They don't say we can never imagine any situation where a city could ever be liable for off-duty conduct. What it does say is, under the Cheyney and Danger creation, that there are certain circumstances where a municipality could potentially be liable for off-duty conduct, but these two cases don't fall within that scope. It would seem to me if this case doesn't come within that, then there is no case that could possibly do it. And let's just say so, and so not waste people like my time, people like my time, chasing our tails. If the answer is no, under no circumstances can a city ever be liable for off-duty conduct, then it'll make it easy for a lot of people. But as long as Van Orden and Huffman say, yes, you know, hypothetically, theoretically, based on the law and the precedent, that situation can occur and we get into causation. And as this Court knows, causation is typically, traditionally, a question of fact for a jury. Why are we afraid to let a jury decide this issue? Oh, my God. You know, geez, people might vote. I mean, if people can elect presidents, can't people decide issues of causation on whether an off-duty officer's conduct should be, can be tied to a custom or policy of a police department? Why are we afraid of juries deciding these issues? This isn't strict liability. We could go to trial and lose. We could go fall flat on our face. The only issue before this Court is if you draw all inferences in our favor, could a jury draw a reasonable inference that there's a causal relationship between the custom and what Alex Fager, Senior, Alex Fager, Jr., and two other officers with him did on the street that night when you have a causal, a direct causal relationship, almost identical conduct that he's doing on duty for which he is never disciplined. In fact, if anything, it seems like he's encouraged. He has reason to be encouraged to engage in this conduct. I basically think he's bulletproof. Why wouldn't he think he could do the same thing, identical conduct off-duty, and get away with it? In fact, the evidence in this case bears out that what he believed was true. He did get special treatment. He was protected. He wasn't treated like another citizen. He was treated like a sacred cow. And so what happened in this case after he was arrested just confirms the existence of the preexisting custom that the police officers in San Francisco, I mean, especially if your father is the assistant chief, but not necessarily because we know from all these reports in the record, I mean, this wasn't just Alex Fager, Jr., who got special And most of that misconduct, I mean, the garden variety complaints of citizens are things like, you know, he pushed me around, he used excessive force. I mean, this is what most people complain about when they deal with the police. I looked at the reports that are in the record concerning the citizens' complaints and so on. Is there any evidence in the record that San Francisco Police Department officials or officers were protected in their off-duty? Other than this example, do you have anything else in those official reports that suggests a connection between that the police department was protecting its own when its officers engaged in misconduct off-duty? Not that I'm aware of. As far as I know, there's no evidence going the other way that they were treated differently off-duty either. And it seems to me, I mean, this is a factual issue that could be developed further at trial, but there is two sides to that coin. I mean, those reports don't say, jeez, we, you know, when it's off-duty conduct, we really come down on them. So, you know, which way do you want to draw inferences on that fact? Because you could also draw an inference that the fact that it's not mentioned doesn't mean that they are treated differently for off-duty conduct. And I don't know if you want to give Mr. Cunningham some time. DE SHANEY, HENRY STARR COURT REPORTER, CHAMBER OF COMMERCE COUNSELOR,  DURING THIS EXAMINATION TO?! DE SHANEY HAS A VERY INTERESTING QUOTE. AND IT'S IN THE HUFFLING DECISION AND THAT IS, FOR DANGER, CREATION, YOU DON'T LEAVE THE VICTIM IN A WORSE POSITION THAN YOU FOUND HIM. NOW, WHEN DE SHANEY WAS A CHILD TAKEN OUT OF A HOME WHERE HE WAS BEING ABUSED, THE STATE TOOK HIM AND THEN THEY RETURNED HIM. THEY RETURNED HIM TO THE STATUS QUO. THE IDEA BEING THERE'S NO AFFIRMATIVE ACT BECAUSE WE DIDN'T, YOUR FATHER, WHO'S ABUSING YOU, WE DIDN'T MAKE HIM A WORSE ABUSER. WE JUST RETURNED YOU TO THE STATUS QUO. YOU DIDN'T GO BACK TO A WORSE POSITION. IN THIS CASE, WE HAVE A CUSTOM THAT MAKES THINGS WORSE. AND IT MAKES CITIZENS IN SAN FRANCISCO HAVE TO BE IN A CITY WHERE THIS CUSTOM IS MAKING THINGS WORSE. IT'S NOT A STATUS QUO SITUATION. THANK YOU, COUNSEL. MR. CUNNINGHAM? THANK YOU, RONAN. I DON'T REALLY HAVE A GREAT DEAL TO ADD. I JUST, MR. SCOTT IS THE ONE WHO LITIGATED THIS CASE ALL THE WAY THROUGH. I CAME IN KIND OF LATE. WE LITIGATED THE STATE COURT CASE TOGETHER. I WAS ONLY IN ON THE TAIL END OF THIS CASE. HE WROTE THE BRIEF AND HE'S DONE AN EXCELLENT JOB THIS MORNING. I DON'T KNOW WHY HE DIDN'T MENTION THE BLAIR CASE WHEN YOUR HONOR ASKED HIM WHAT HIS BEST CASE WAS, BECAUSE I KNOW HE LOVES THE BLAIR CASE. AND THE BLAIR CASE DID AFFIRM THE POSSIBILITY OF GETTING AT OFF-DUTY CONDUCT IN A SITUATION THAT IS ANALOGOUS ENOUGH. IF WE WERE TO CRAFT A RULE ON OFF-DUTY CONDUCT, WHAT WOULD WE SAY? I THINK YOU'D HAVE TO SAY THERE HAS TO BE A MINIMAL AMOUNT OF CONGRUENCE BETWEEN THE CONDUCT ON DUTY, THE CONDUCT THAT, THE ON-DUTY CONDUCT THAT GIVES NOTICE TO THE DEPARTMENT. AND SHOULD PUT IT, YOU KNOW, DRAW ITS ATTENTION TO THE OFFICER AND THE CONDUCT OFF-DUTY. SO THAT IT'S FAIR TO HOLD THEM TO THE SAME RULE. I MEAN, IT'S IMPORTANT TO REMEMBER THAT THE CUSTOM THAT WE'RE TALKING ABOUT HERE IS A WRETCHED THING. YOU KNOW, IT'S MALFEASANCE THAT'S SYSTEMIC AND DEPARTMENTAL AND IN DEROGATION OF THEIR WRITTEN POLICIES AND THEIR OBLIGATIONS UNDER THE LAW. SO IT'S NOT AS IF THEY'RE SUPPOSED TO BE NICETIES OF DEFERENCE TO THE DEPARTMENT IF THE UNDERLYING POLICY OR CUSTOM AND PRACTICE IS SHOWN ADEQUATELY THE WAY IT HAS BEEN HERE AND THE WAY THE EVIDENCE DOES HERE. AND, YOU KNOW, I WANT TO ALSO CALL ATTENTION TO THE FACT THAT WE GAVE A NOTICE OF RELATED CASE TO ANOTHER CASE THAT RELIES ON THIS SAME EVIDENCE, WHICH THE CITY HAS MANAGED TO STAVE OFF GETTING BRIEFED SO FAR. SO IT'S NOT READY FOR YOUR CONSIDERATION, BUT IT IS EVEN STRONGER EVIDENCE. I HOPE YOU DO, AND I HOPE THAT YOU KEEP THESE SAME ARGUMENTS IN MIND. I WANT TO ASK YOU, COUNSEL, ASIDE FROM THE QUESTION OF CONGRUENCE BETWEEN THE OFF-DUTY AND ON-DUTY CONDUCT, HOW MANY INSTANCES DOES THE DEPARTMENT NEED TO HAVE BEFORE IT'S GOT A RECORD THAT IT CAN SAY THIS OFFICER IS A DANGER OFF-DUTY AND ON-DUTY AND WE ASSUME LIABILITY FOR HIS CONDUCT OFF-DUTY? I'M NOT — I HAVE TO DISTINGUISH BETWEEN THE TWO RECORDS. NOW, I BELIEVE THIS RECORD SHOWS THAT THERE WERE 16 USE OF FORCE INCIDENTS IN THE 13 MONTHS OF HIS CAREER, BEGINNING WHEN HE WAS STILL IN, WHAT DO YOU CALL IT, FIELD TRAINING. DO YOU HAVE A RECORD SITE FOR THAT, COUNSEL? I DON'T HAVE IT, JUDGE. I COULD PROVIDE IT. I WILL DO THAT. I'M SORRY, I CAN'T GIVE IT TO YOU RIGHT NOW. BUT THERE WAS A NUMBER OF INCIDENTS, THERE HAD BEEN SEVERAL, OR A COUPLE OR THREE, COMPLAINTS TO THE OFFICE OF CITIZENS' COMPLAINTS IN ADDITION TO THE TRIGGERING OF THE SUPPOSED COUNSELING PROCESS WITHIN THE DEPARTMENT IN WHICH AFTER THREE USE OF FORCE REPORTS IN A QUARTER, I THINK, THERE'S SUPPOSED TO BE A FORMAL COUNSELING SESSION WITH A SUPERIOR OFFICER. THERE WAS ONLY ONE OR TWO IN THE SPACE OF TIME WHERE ALL OF THESE INCIDENTS OCCURRED. AND THEN THE SMITH, OR THE INCIDENT WRITTEN ABOUT BY SERGEANT STANSBURY CAME ALONG AND WAS THE MOST AGGRAVATED THING YOU COULD IMAGINE IN TERMS OF MISCONDUCT, NOTIFYING THE DEPARTMENT AND THE ENTIRE CHAIN OF COMMAND THAT YOU HAD A LUNATIC HERE. I MEAN, A GUY WHO THE SERGEANT COULDN'T EVEN CALM DOWN, AND HE'S SWEARING AT THE GUY AND THREATENING TO KILL HIM ON THE STREET IN FRONT OF PEOPLE, AND WON'T GO SIT IN THE CAR, WON'T DO ANYTHING, AND TELLS HER, GO AHEAD AND WRITE ME UP, I'M THE CHIEF'S SON. I MEAN, YOU KNOW, THIS IS A VERY EXAGGERATED CASE, AND I CAN SEE WITHIN YOUR QUESTION YOU CAN'T SET A POLICY BASED ON SUCH EXTREME FACTS. IS THE RESPONSIBILITY OF THE POLICE DEPARTMENT AT THAT POINT THEN TO FIRE THE OFFICER? I THINK I LOST MY PODIUM HERE. IS IT TO FIRE THE OFFICER BECAUSE THAT THEN REMOVES THE PROTECTION OF THE POLICE DEPARTMENT? I MEAN, THEY CAN'T PUT A CAGE AROUND HIM. THEY CAN'T JAIL HIM. I THINK CERTAINLY THEY SHOULD HAVE FIRED HIM RIGHT THEN AND THERE. YES, ABSOLUTELY. THEY WOULD HAVE IF HE HADN'T BEEN THE CHIEF'S SON. IF THEY DON'T FIRE HIM, THEN THEY ASSUME THE LIABILITY FOR WHAT HE DOES OFF DUTY. I SHOULD THINK SO IF IT'S THE SAME KIND OF STUFF AND IT COMES FROM THE SAME UNCONTROLLABLE IMPULSES AND THE SAME FLYING OFF THE HANDLE KIND OF TENDENCY THAT HE DISPLAYED SO CLEARLY IN THE ON DUTY INCIDENT AND THAT ALSO OTHER INCIDENTS WERE RECOUNTED BY STANSBURY IN HER MEMO ABOUT THE ONE INCIDENT SHE WENT BACK AND TALKED ABOUT OTHER THINGS WHERE HE WAS OUT OF CONTROL GUY. AND THAT HE'S NOT THE ONLY ONE. BUT HE WAS MAYBE PERHAPS THE MOST AGGRAVATED CASE YOU COULD IMAGINE OF THAT. BUT CERTAINLY IN CIRCUMSTANCES WHERE THEY NEVER DO ANYTHING ABOUT ANY OF THEM, YOU'VE GOT TO HOLD THEM LIABLE. YOU'VE GOT TO MAKE THEM RESPONSIBLE. THAT'S THE PROBLEM HERE. AND THAT'S WHY I WANT TO GET UP AND TALK ABOUT IT TOO. I THINK THE PROBLEM IS BECAUSE IT'S SUCH A DEEP AND IMPORTANT PROBLEM. AND THE COURT CAN'T SIT BACK AND PARSE, YOU KNOW, NICETIES OF NOTICE AND CAUSATION. LET A JURY DECIDE THAT. AND THE COURT CAN'T SIT BACK AND PARSE, YOU KNOW, NICETIES OF NOTICE AND CAUSATION. THE COURT CAN'T SIT BACK AND PARSE, YOU KNOW, NICETIES OF NOTICE AND CAUSATION. BUT IF THE EVIDENCE SHOWS THIS TERRIFIC DEFAULTATION, DEFAULT GENERALLY ON THE PART OF THE SUPERVISION AND THE DEPARTMENT AND THE CONTROL OF THIS MOST IMPORTANT POWER THAT THE COPS HAVE, THEN THERE'S GOT TO BE ACCOUNTABILITY. YOU CAN'T BE LOOKING FOR REASONS TO THROW THE CASE OUT. YOU'VE GOT TO BE LOOKING FOR REASONS TO GET IT TO JUDGEMENT. Thank you, Counselor. All right. Thank you. Mr. Neudorf. Good morning, Your Honors. And you appear to be, just so Mr. Scott is assured, you've appeared in front of me before, too, right? That's right. Just a couple of months ago, Your Honor. But never before the other two judges on this panel. Go ahead. David Neudorf, Deputy City Attorney in the San Francisco City Attorney's Office for Defendants, City and County of San Francisco. And Alex Fagan, Sr., with me at the counsel table is my friend and colleague, Deputy City Attorney Sean Connolly. This is a 14th Amendment case, and there are two definitive issues in this case. Both ruled uncorrectly by the trial court below. First, there was no state action involved here, and therefore no deprivation of a constitutional right under the 14th Amendment. And second, there was no causation of the harm here between any official custom policy or practice. The 14th Amendment, as the Supreme Court has stated, as this Court has stated many times, is fundamentally a restriction on state action. The state shall not deprive anyone of life, liberty, or property without due process of law. In this case, there is no factual dispute over who caused the harm to the plaintiffs in this case. It was three private individuals. There was a question about the record, and the record states no evidence that these individuals were armed. It's quite clear from the record that there was no incidence of police authority that was used during this random confrontation on the street. There was no badge displayed. No one said, I'm a police officer. No one took out handcuffs or had handcuffs. No one was taken under arrest. These were officers. Kennedy. Let's assume for the sake of argument that a badge had been displayed. Does that change the result? Absolutely. Because if a badge had been displayed, there is your state action. There is your use under – there is your action under color of law. Plaintiffs in this case had no indication. No one gave them indication that there was any police conduct involved here or any police officers involved here. Could I explore what seems to me at least a problem for you? It seems to me police officers are in a somewhat different category from civil servants generally. You work in city attorney's office. That doesn't encourage you to go out in the street and beat somebody up. But you're a policeman. You're used to going out there. You may be used to ordering people around. You have authority that goes with your position. And I think you can make the argument a policeman is in a different position from anybody else I can think of. I think you can make the argument a policeman is in a different position from anybody else I can think of in the governmental structure. He's been armed. He wasn't armed in this case, but that's the way he presents himself. And he has certain physical powers which are unusual. Your Honor, if I go out tonight and give some bad legal advice, the city is not liable for malpractice. That's the same case we have here. Yes, Your Honor is absolutely correct that officers are different. An officer could make an arrest, could invoke State power if he happened to come across a crime on the street. And that points out a fundamental flaw in plaintiff's whole theory of the case. Let me stop you there. I just want to probe that just to make sure I understand correctly. Had one of these officers seen some misconduct out there on Newman Street at 2.30 in the morning, even if they were not carrying a badge, were not carrying a gun, had no other indicia of their authority, would they have been entitled to make an arrest? Well, Your Honor, everyone in California is entitled to make a citizen's arrest. Would it be a citizen's arrest under those circumstances if they're not carrying a badge? And a peace officer could make a custodial arrest, not a citizen's arrest. I don't believe that a badge is required. Okay, so all he has to say is, I'm San Francisco Police Department, you're under arrest, even though he hasn't got any other visible sign of authority. That's correct. But that power, that nascent power, so to speak, never came into play here. And the fact that it could have, if he could have flashed a badge, a police I.D., said I'm a San Francisco police officer, you're under arrest. If there had been any indication that he was investigating a crime, responding to a crime, then this would be a different case because you would have state action. But aren't you knocking down a straw man with this? Because that's not really the allegation here. They don't make that claim anywhere that they were acting at the time by identifying the civil officer. What the claim is, is that there was a custom or practice of encouraging, allowing one of their claims, I should say, aside from training and so forth, is that there is a custom and practice of forgiving, if you will, police officers who committed crimes on the street or commits assault, that those crimes aren't going to be enforced, that they're not going to be investigated, they're not going to be investigated well if they are investigated. And that encourages people then to use, perhaps, force in situations in which they would not otherwise feel that they could use force. Plaintiff's theory in this case is very close to what the Court has just stated, which is that there is some official custom or policy or practice that relates to failure to adequately discipline on-duty misconduct that they claim was approximate because of the off-duty private actions of these individuals at 2.30 in the morning on Union Street. Now, there's two crucial things here. One is the kind of conduct that is involved in a random encounter, in the wee morning hours on the street in front of a bar over a bag of steak fajitas, which haven't been mentioned so far, but that kind of conduct bears no resemblance to the use of force that is authorized, expected, and under the right circumstances, privileged to be used on the job. And, yes, it violates the Constitution if in the course of making a lawful arrest excessive and unreasonable and unnecessary force is used. That does not convert it into a random violent encounter on the street, which is what happened here. Counsel, I understand that this is not going to be your case, but if you had an officer who had a long history of citizen complaints, a long history of abuse and internal reports suggesting that the officer was abusing his power, and while off-duty, he engaged in similar kind of abusive behavior, would the city under those circumstances be liable? No. And the reason is the Court asked in a different question of plaintiff, if the Court were to craft a rule about off-duty conduct, what would it be? Well, the answer is this Court has crafted a rule about off-duty conduct, and it's Van Oort, and it's very similar to the hypothetical you just gave in which Deputy Sandwich Stingwich of the, I believe it's San Diego was the jurisdiction, the County Sheriff's Department had a history of on-duty misconduct. And Mr. Scott has said that Van Oort is distinguishable because he wasn't engaging in burglary while he was on duty. Those were not the citizen complaints. The police department wasn't on notice that the guy was breaking into houses. Well, similarly, there's nothing in the record here to show that any officer involved in this off-duty incident was involved in random violence on the street, which is really what we're talking about here. Are you saying they were involved in planned violence on the street? I mean, the evidence is in the record that you have an officer who has had some violent encounters with people. I don't think it should dance around that. The question is, is that enough to, for them to have liability in this case? No. And the basis on which plaintiffs attempted to distinguish Van Oort is they're saying that there's some similarity here. Right. And it's not, and the Court is right. It's not the difference between planned or unplanned. What is the difference is what I've alluded to, which is that the use of force in the And I want to get to what is the record on that, because the Court also has questions about that, but it's categorically different than off-duty misconduct. And, yes, the armed home invasion robbery was more egregious than a drunken brawl on the street, but that is not, that doesn't make it more foreseeable. What you have in Van Oort is the same claim that plaintiffs attempt to make here, which is that there was a custom policy or practice that was official of not adequately disciplining for on-duty uses of excessive force, and that was Deputy Stainwich's situation. He had complaints against him. And this Court has said, as a matter of law, that that does not make it foreseeable that there would be off-duty criminal conduct. Let's assume that the allegation in this case is that there's a custom or practice of not prosecuting officers who commit what otherwise would be crimes off-duty, that the custom or practice is to wink and nod and take care of your own. That's the custom and practice pled. And I realize that you believe that that's not pled in this case, but just assume hypothetically. If that's a custom and practice, isn't there an argument that there's a state-created danger, in other words, under that theory, that there's potential manel liability? That hypothetical cure is one of two flaws in plaintiff's theory. It cures the problem that there's a real gulf between what the plaintiff policy is in terms of on-duty versus the harm which is off-duty. What it doesn't cure is yet another fatal problem in plaintiff's claim, which is that they're suing the city and county here. They're not suing the three individuals. And the cases of the – that makes it a manel case. And what the cases have said is there is a stringent causation requirement to show manel. And if you don't have harm actually caused by a State actor, there is an even higher threshold, and that's what Van Oort says, and that's what all the Ninth Circuit cases on the state-created danger exception say. That additional higher threshold is you have to have affirmative conduct. And as I understand the Court's hypothetical is if they don't adequately criminally prosecute off-duty conduct, that somehow – No, if there's a customer practice of communicating to officers, they're not going to be liable or investigated for off-duty conduct. Do you think that's sufficient to state a cause of action that would – under 1983? I don't think so, because what we're talking about is semantics. Affirmative conduct as used by this Court clearly means that, as plaintiff said, and I don't think it helps him, but as plaintiff's counsel said, that the affirmative conduct left the plaintiff worse off than when the State actor found him. And if the hypothetical, again, addressing the Court's hypothetical, is that there was an official custom policy or practice of not adequately prosecuting off-duty crimes, even if that was known to everyone in the department, that does not create affirmative conduct. Under this Court's case – So can you envision any circumstance under which a municipality would be liable for off-conduct of its officers? I'm listening to you right now. This is an extreme hypothetical and just a possibility. But if there were – again, we're talking here about a policy of failing to adequately discipline. But let's say, in fact, there was an affirmative official policy that said that after your shift is over, you have to go out on the street and beat someone up. Then you would obviously have very little difficulty in showing a link between the official custom policy or practice and the affirmative conduct that led to the injury. And that is many levels removed from the actual record in this case, which is a policy of not adequately disciplining on-duty misconduct. You know, there was a case, though, out of Los Angeles in which the allegation was made that the indemnification of officers, the policy of the city council in indemnifying officers in these cases constituted a ratification and a policy of saying we're going to protect you and therefore it was a moving force. And we said in that case we didn't reach that issue because we said there was no proof of the policy. But we held out the possibility that under those circumstances that would be sufficient to establish a policy or custom. And that's not much different from the idea that if you have a policy or custom of not prosecuting or not investigating and not charging that's communicated that that potentially could create liability. I'm not familiar with that case, but to the extent that you're talking about the concept of ratification, that's talking about a way to get at municipal liability. Actually, the allegation was that the policy was to indemnify, not that it was a ratification. I think it was separately pled, but the argument was that that constituted policy. Again, I'm not familiar with that case. The Ninth Circuit has said what is affirmative conduct that qualifies for that highest threshold of causation when you have harm caused not by the State but by private individuals and you're trying to connect that to some official custom policy or practice. And starting with the Wood case, you have a foreseeable, identifiable plaintiff who was a passenger in a car where the driver was stopped for drunk driving early in the morning, and the officer stranded her in a high-crime area. She's later raped, not by State actors, but by private individuals. And that is affirmative conduct. You have the Grubbs case that was before this Court twice, where you have a State employee who is assigned to work alone with a violent felon, and that creates the situation where the State employee was assaulted by a known violent felon that the State forced her to work with alone. That is affirmative conduct. Then on the other side of the ledger, which is this case, you have Van Oort and Huffman, where you have an unforeseeable plaintiff, you have off-duty conduct, and instead of affirmative conduct, which is necessary to link the private deprivation to the custom and policy, you have an allegation in the Van Oort case that the failure to properly discipline deputies, same which for on-duty misconduct, somehow led to off-duty misconduct. And this Court's saying, no, that's not affirmative conduct. The Wood case, the stranded passenger case, the Grubb case, the State employee with a violent felon, or the Munger case, where it's a cold evening, freezing evening, obviously not in San Francisco. There aren't too many of those, or in Berkeley. And the police eject a drunk bar patron who's wearing very light clothing, and he ends up freezing to death. That's affirmative conduct, not a custom, policy, or practice of not adequately disciplining for on-duty misconduct. Mr. Donohue, I'm just not sure whether you can make this sharp distinction between affirmative and negative. And let me start with a very far-out hypothetical. I apologize, because it doesn't fit the case at all. But start with a man who keeps a pet bulldog. He puts the dog out in the yard. The dog is generally peaceful. And then somebody comes along, and the dog bites him. And the man doesn't do anything about it. And a couple weeks later, the same thing happens. And then a couple weeks later, the third thing happens. Now, you could say the man did nothing. The dog did all the biting. The man just had him there. And you could say he took no affirmative act. Now, I don't want to offensively compare the officers to bulldogs, but you could make that analogy that these people were put on the police force. They did beat up people. And the city didn't do anything about it. So was that affirmative or negative? Mr. Donohue. Well, in our case, it was inaction. But with the hypothetical use of the bulldog case. Well, let me try and explain it the best I can, because I think there is an issue that sometimes gets stated that, well, because we're claiming this was an official policy, and I think this is behind the Court's question, that we're talking about affirmative conduct because we're claiming it's an official policy. The hypothetical of the bulldog, classic negligence, because you had someone with notice of the dangerous propensities of their dog and didn't do anything. And that failure to act is classic negligence. But there's a distinction between knowledge, consciousness, or even deliberate indifference in affirmative conduct. Because what the Ninth Circuit cases say, when you have an overlay of municipal Monell liability and the Descheny state-created danger exception, you need two things. To get at the city, you need deliberate indifference, which is a form of the consciousness, the knowledge that the dog will bite. And you need that extra thing which is different, affirmative participation in causing the harm. And what the cases have said is that it's not an – if this were an on-duty case, deliberate indifference, the fact that we knew that our officer might bite, so to speak, that can create on-duty municipal liability. But when you have off-duty conduct, it's not enough even to have knowledge. That goes right back to the Supreme Court's Descheny case. But do you believe – may I interrupt for a second? Do you believe that the Department retains the ability and the power to discipline officers for off-duty conduct? I'm sorry. Does the Department have the – Does the police department retain the power to discipline officers for off-duty conduct? I don't know as a factual matter if they do or not. I don't see any legal impediment to them having such a policy. So if the Department – and most departments do claim that they have the ability and the power to discipline officers for off-duty conduct – if they retain that power, doesn't that imply some responsibility? In other words, if you're – if you have a policy of disciplining officers for off-duty conduct, and it's not this case, but let's assume that there's – they're aware of that scenario, do you see a potential for liability? No. I think that gets to the same distinction between deliberate indifference or consciousness of the risk versus affirmative conduct. And it's not enough to assert the power to take an action, because in the Descheny case, the county social workers retained and said they had the power to take young Joshua Descheny away from his natural father, who was abusive. And, in fact, they had repeated knowledge, notice and complaints of his severe abuse of the 4-year-old child. And what the Supreme Court said, what we have here is a case of state functionaries who claim the power to protect the child and the power to take him away from the father and who, in suspicious circumstances, didn't do anything, didn't do more. And that does not violate the 14th Amendment. So merely retaining or even stating that we have the power to discipline for off-duty conduct, again, that's not our case. But the hypothetical of just retaining the duty to discipline for off-duty misconduct doesn't create a affirmative conduct case. Any further questions from the panel? Thank you for your argument. The case I was thinking of was Torino v. Gates, by the way, the L.A. case. Thank you. Thank you very much. Mr. Scott, rebuttal. I'll give you a couple minutes. I appreciate it. I know for a fact, because I represent a San Francisco police officer who has been disciplined for off-duty conduct, and it's one of those rare events, but I can represent the Court it does occur because I represent a San Francisco police officer who it occurred to. I would like, and I regret I didn't talk about Blair, and I guess one could say the And in the Blair case, we had an unwritten policy, we had a custom that's well-known throughout the United States. It has to do with code of silence and retaliation and harassment against officers who break the code of silence. And Justice Noonan, in what I thought was a very well-reasoned opinion, recognized that there was a Christopher Commission report that acknowledged how widespread and pervasive it was. And then the next issue became, in the Blair case, he was being subjected to harassment and threats and retaliation both on and off-duty. And one of the issues that Justice Noonan said should go to the jury in that case was did this custom of allowing to perpetuate and encourage this retaliation against snitches, against cops who broke the code of silence, can that go to the jury for both his harassment that he suffered by other cops when they did it both on and off-duty? And I may not be quoting it exactly, but my recollection is the Blair court said, we don't see why there should be any significant fine line between distinguishing whether if police officers are retaliating against a snitch, against another cop who broke the code of silence. And this code of silence is something that's encouraged. It's a custom that's being promoted by the police department. And if these officers are retaliating against him, whether it's on or off-duty, why should we necessarily make a fine point distinction between the two? Let the jury sort it out. And I submit that this case raises issues that a jury should sort out. Maybe we'll prevail. Maybe we won't. But if people can elect presidents, people can sort this issue out. It's a matter of public concern, and I think the public should decide these tribal issues are fact. Thank you. Thank you, Mr. Scott. The case discord will be submitted. And that concludes the oral arguments this morning.
judges: Noonan, Thomas, Bybee